Archie **BAIRD** et al., Plaintiffs-Appellees and Cross-Appellants,

v.

**WAGONER TRANSPORTATION COM- PANY** et al., Defendants-Appellants and Cross-Appellees.

Nos. 19570–1.

United States Court of Appeals, Sixth Circuit.

April 17, 1970.

John P. Boeschenstein, Muskegon, Mich., for defendants-appellants and cross-appellees; Schoener, Collinge. Boeschenstein & Barlow, Muskegon, Mich., H. William Butler, Arthur P. Boynton, Clark, Klein, Winter, Parsons & Prewitt, Detroit, Mich., on the brief.

Stephen C. Bransdorfer, Grand Rapids, Mich., for plaintiffs-appellees and cross-appellants; Miller, Johnson, Snell & Cummiskey, James L. Stokes, Grand Rapids, Mich., on the brief.

Laurence H. Silberman, Solicitor of Labor, Bessie Margolin, Associate Solicitor, Carin Ann Clauss, Betty Jo Christian, Attys., U. S. Dept. of Labor, Washington, D. C., Aaron A. Caghan, Regional Atty., on brief as amicus curiae, for George P. Shultz, Secretary of Labor.

Before CELEBREZZE and McCREE, Circuit Judges, and WILSON *, District Judge.

CELEBREZZE, Circuit Judge.

This is an appeal from the United States District Court for the Western District of Michigan in an action by 19 Wagoner Transportation truck drivers against Wagoner, pursuant to the Fair Labor Standards Act of 1938, as amended in 1961, 29 U.S.C. § 201 et seq. (1964) [hereinafter sometimes referred to as "FLSA"]. The case was tried without a jury and the facts were generally uncontested. The parties stipulated that Wagoner was an "enterprise engaged in commerce within the meaning of Section 3(s) of the Act," 29 U.S.C. § 203(s); and that Wagoner had not paid for and would be liable under the FLSA for certain overtime work which the drivers had done over several years, unless Wagoner was exempted from the maximum hours provisions of the FLSA, 29 U.S.C. §§ 213(b) (1), 216(b). The District Court held that the 19 Wagoner

* Honorable Frank W. Wilson, District Judge, E. D. Tennessee, sitting by designation.

truck drivers were not exempted from the maximum hours provision of the FLSA and awarded them overtime back pay, counsel fees and costs, but denied their claim for liquidated damages. Wagoner appeals and its 19 truck drivers cross-appeal for liquidated damages. 29 U.S.C. §§ 216(b), 260.

Appellant is a motor carrier for hire engaged in the transportation of petroleum products, in bulk, in tank vehicles. At all times herein relevant, Appellant transported petroleum products for a wholly-owned subsidiary of Standard Oil of Indiana [hereinafter "Standard"]. For the past ten years, including the period involved, none of Appellant's drivers ever transported petroleum products outside the State of Michigan, although Appellant did have a dormant Certificate of Public Convenience and Necessity authorizing it to transport petroleum and petroleum products from Granger, Indiana to points in Michigan.

Standard ships its oil to its Muskegon terminal on the basis of highly sophisticated forecasts of its customers' needs. Statistical projections never being precisely accurate, if Standard mis-estimates its customers' actual needs, Standard borrows or buys petroleum from its nearby competitors to fill the orders.

All customer orders are placed with Standard's sales department, which informs the terminal manager and Wagoner of the quantities and destinations of the various petroleum products which are to be delivered to points within Michigan from the Muskegon terminal. Standard gives copies of its forecasts to Wagoner so that Wagoner will have equipment available to handle actual orders. While the evidence did not reveal the average amount of time the petroleum products are in "inventory" pending the receipt of actual orders, Standard acknowledges that the "through-put" of the Muskegon terminal in any given year is about six times its tank capacity. If the terminal tanks were, on the average, one-half full, then petroleum products in the Muskegon terminal would be inventoried for an average length of one month.

Standard has more than 200 customers in the Michigan area served by the Muskegon terminal and Wagoner, under a variety of financial arrangements. Direct shipments to industrial plants and schools compose about 25 to 30 per cent of the shipments from the Muskegon terminal. Sales to some 77 service stations and 70 Standard bulk plants comprise the remaining 70 to 75 per cent of the shipments. The actual method of ordering varies: some customers have requirements contracts; others call each time they want an order; some are regular customers (including its own bulk plants) whose supply is maintained at a level by Standard; while a few customers order on an infrequent and irregular basis. Although Standard knows the identities of all its customers at the time it makes shipments to Muskegon, it does not know precisely the amount of petroleum each customer will actually order.

The sole issue on this appeal is whether the Appellants, who otherwise admit they are covered by the Fair Labor Standards Act, are excluded from its maximum hours provision by Section 13(b) (1) of the Act, 29 U.S.C. § 213(b) (1) (1964).

The FLSA provides that any employee who "is engaged in commerce or in the production of goods for commerce" shall be paid a minimum of "one and one-half times the regular rate at which he is employed" for every hour over 40 hours he works in a workweek. However, an employee is exempt from the benefits of this provision of he is

"(b)

\* \* \* \*

(1) Any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of Section 304 of Title 49 (The Motor Carriers Act of 1935)." 29 U.S.C. § 213(b) (1).

The Motor Carriers Act of 1935, 49 U.S.C. § 301 et seq. [hereinafter sometimes referred to as MCA] extends the power of the Commission to "motor carriers engaged in interstate * * * commerce." 49 U.S.C. § 302(a). "Interstate commerce" is defined under the MCA as

"(10) * * * commerce between any place in a State and any place in another State or between places in the same State through another State, whether such commerce moves wholly by motor vehicle, or partly by motor vehicle and partly by rail, express, or water." 49 U.S.C. § 303(a) (10).

Thus, the Interstate Commerce Commission has the "power to establish qualifications and maximum hours of service" for truck drivers only if they are engaged in "interstate commerce" for purposes of the MCA.

While the parties have stipulated that they are engaged in "interstate commerce" for the purposes of the FLSA, such stipulation does not necessarily require a conclusion that their activities were in "interstate commerce" for the purposes of the MCA. The scope and meaning of "interstate commerce" in each Congressional Act presents a "unique problem in which words derive vitality from the aim and nature of the specific legislation." Federal Trade Commission v. Bunte Brothers, 312 U.S. 349, 351, 61 S.Ct. 580, 85 L.Ed. 881 (1940). Whereas the FLSA covers employees "engaged in commerce or in the production of goods for commerce" 29 U.S.C. §§ 203, 207(a) (1), the MCA only covers employees actually "part of a continuous movement in interstate commerce." Shew v. Southland Corporation (Cabell's Dairy Div.), 370 F.2d 376, 380 (5th Cir. 1966). Whereas the former Act would apply to employees "in the production of goods for commerce" even though such employees handled or sold such goods prior to or after their actual "continuous movement" in interstate commerce, the MCA would not. Gal-

breath v. Gulf Oil Corporation, 413 F.2d 941 (5th Cir. 1969), 29 U.S.C. § 203(s).

■ This Court must determine whether the Appellees are employees over whom the Interstate Commerce Commission has power under the MCA. Morris v. McComb, 332 U.S. 422, 68 S. Ct. 131, 92 L.Ed. 44 (1947). If Appellees are within the Commission's power, as defined in the MCA, they are exempted from the maximum hours provisions of the FLSA and not entitled to recovery for overtime. Levinson v. Spector Motor Service, 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158 (1947).

The Interstate Commerce Commission, after years of extensive hearings (1955–1957), issued industry-wide guidelines to indicate when the transportation of petroleum and petroleum products by motor carriers within a single state is interstate commerce. See Ex Parte No. MC–48, 71 MCC 17 (1957). The criteria used in Ex Parte No. MC–48, were incorporated into an interpretive Bulletin of the Wage and Hour Division, United States Department of Labor outlining the scope of the 13(b) (1) exemption to the FLSA. Code of Federal Regulations § 782.7(b) (2) provides:

"(2) The Interstate Commerce Commission has held that transportation confined to points in a single State from à storage terminal of commodities which have had a prior movement by rail, pipeline, motor or water from an origin in a different State is not in interstate or foreign commerce within the meaning of Part II of the Interstate Commerce Act if the shipper has no fixcd and persisting transportation intent beyond the terminal storage point at the time of shipment. See Ex parte No. MC–48 (71 M.C.C. 17, 29). The Commission has specifically found that there is no fixed and persisting intent where (i) at the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through

to a specific destination beyond the terminal storage, and (ii) the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and (iii) transportation in the furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage. While Ex parte No. MC–48 deals with petroleum and petroleum products, the determination indicates that the same reasoning applies to general commodities moving interstate into a warehouse for distribution (71 M.C.C. at 27). Accordingly, employees engaged in such transportation are not subject to the Motor Carrier Act and therefore not within the section 13(b) (1) exemption. They may, however, be engaged in commerce within the meaning of the Fair Labor Standards Act."

■ The United States Supreme Court has held that where the United States Department of Labor and the Interstate Commerce Commission construe the FLSA and the MCA consistently, their construction "is entitled to great weight." Boutell v. Walling, 327 U.S. 463, 471, 66 S.Ct. 631, 90 L.Ed. 786 (1946) (involving prior consistent agency interpretation of § 13(b) (1). *See* United States v. American Trucking Association, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). The District Court applied the agency criteria in Ex Parte No. MC–48 and properly accorded it "great weight."

In Ex Parte No. MC–48, the Commission specifically indicated that truck drivers are not engaged in "interstate commerce" under the MCA and not subject to the jurisdiction of the Commission where the following three factors are present: (1) "specific orders" of a "specific quantity" are not moved from one state through the terminal storage of a second state to a specific customer; (2) the use of the terminal storage as a "local marketing facility" from which products are "sold or allocated;" and (3) transportation in the furtherance of such "distribution within a single state is specifically arranged only after sale or allocation from storage."

■ Each of these three factors is present in the instant action. First, the District Court found that Standard shipped to the Muskegon terminal on the basis of sophisticated forecasts and that Standard knew each of the customers who would ultimately be served by that shipment, but that the "specific quantity" to be shipped to a given destination was not fixed at the time of shipment to the terminal storage. Many of Standard's accounts might, in fact, order substantially more or substantially less than was "forecasted" to them by the Standard sales department.

Second, although the District Court observed that Standard did not use the terminal as a retail outlet for petroleum products or in the processing of petroleum products, we find that it may properly be characterized as a "local marketing facility" insofar as the "throughput" of petroleum products was only six times the storage capacity of the terminal and the goods at the terminal were inventory-in-store for actual orders to be placed by Standard's customers. As the District Court summarized:

"No portion of any of the products had been allocated before they arrived in the Muskegon terminal. [Each forecasted Standard customer] would use an unknown quantity."

Third, the record reveals that no final transportation arrangements were made until after the petroleum products were inventoried at Muskegon. While Appellants received copies of Standard's forecasts so as to be able to estimate the amount of equipment to be required at the Muskegon terminal, the arrangements for the transportation of a particular quantity of product to a particular

destination were made only after an actual customer order was received. Actual orders, not forecasts, were used as the basis for "allocation from storage."

Based on these three factors, we agree with the District Court that the Appellee drivers were not engaged in "interstate commerce," as defined by the MCA and Ex Parte No. MC–48.

The four cases relied upon by Appellants are distinguishable. Wirtz v. Lunsford, 404 F.2d 693 (6th Cir. 1969), Galbreath v. Gulf Oil Corporation, 413 F.2d 941 (5th Cir. 1969), Shew v. Southland Corporation, 370 F.2d 376 (5th Cir. 1966), and North Carolina Utilities Commission v. United States, 253 F. Supp. 930 (E.D.N.C.1966).

None of these cases involves the combination of intrastate factors involved in the instant case. It must be noted that in the instant case forecasts, not actual orders by customers, were the basis of the shipments of petroleum products from Whiting, Indiana to Muskegon, Michigan. Further, such forecasts merely reflected the anticipations of customers' needs because Standard had not entered into "requirements contracts" or "specific quantity" arrangements before shipping to the Muskegon terminal. Also, Standard's occasional need to buy or borrow petroleum from nearby competitors to fill customers' orders indicates the "inventory" status of the goods at the terminal. Finally, the low "through-put" of the Muskegon terminal suggests that the products stored there "come to rest" before being delivered to Wagoner's drivers for transportation wholly within Michigan.

In Wirtz v. Lunsford, 404 F.2d 693 (6th Cir. 1969), upon which the Appellants rely, this Court never reached the issue of the scope of "interstate commerce" under the MCA. The Court only held that the parties were engaged in interstate commerce as defined by the FLSA, 404 F.2d at 696, a fact which is conceded by the parties to this action.

In Galbreath v. Gulf Oil, 413 F.2d 941 (5th Cir. 1969), the United States Court of Appeals for the Fifth Circuit found when Gulf Oil Company shipped its products from out of state it had a fixed and persisting intent to transport beyond the bulk plant on the "basis of contractual commitments with customers." Shipments were "predetermined" and products were shipped on a 7–10 day cycle with no more than 15 days storage supply held in the bulk plant at any one time. These facts are inapposite to the instant action in which the specific quantities of customer orders were not "predetermined" and the terminal was used more in the nature of a storage or inventory facility.

Similarly, reliance upon North Carolina Utilities Commission v. United States, 253 F.Supp. 930 and Shew v. Southland Corporation, 370 F.2d 376 (5th Cir. 1966), is misplaced because these two cases involved shipments made with a fixed intent of continuous movement, 253 F.Supp. at 936, or "pursuant to pre-existing orders," 370 F.2d at 380, and remained in the terminal facilities or storage area for "not more than three days," 253 F.Supp. at 936, or "less," 370 F.2d at 380. Unlike the procedures at Muskegon, the products were not held in storage or inventory pending the receipt of actual orders.

Indeed, each of the four cases relied upon by Appellants acknowledges the "great weight" to which the Commission's decision in Ex Parte No. MC–48 is entitled, and applied essentially the same criteria used by the District Court in this action.

 Appellant makes a final contention that its mere possession of a dormant Interstate Certificate of Public Convenience and Necessity gives the Interstate Commerce Commission power over its employees, and, as a result, exempts them from the FLSA. 29 U.S.C. §§ 207, 213(b) (1). The power of the Interstate Commerce Commission to ex-

ercise jurisdiction over a carrier's employees is limited to "activities [which] directly affect the safety of operation * * * in interstate * * * commerce." Levinson v. Spector Motor Service, 330 U.S. 649, 671, 67 S.Ct. 931, 91 L.Ed. 1158 (1947); Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695, 708, 67 S.Ct. 954, 91 L.Ed. 1184 (1947); United States v. American Trucking Assns., 310 U.S. 534, 553, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

The District Court found as a fact that Wagoner "had not utilized since 1959" its authority to engage in interstate transportation of petroleum products under its Certificate of Convenience. This period of disuse began five years prior to the period under contention and carries through to the present. Since 1959, all drivers in Wagoner's employ have driven on intrastate routes granted by the Michigan Public Service Commission. Upon such facts, we find no merit in Appellant's contention that its possession, without any use for several years prior and throughout the period under contention, of an interstate certificate gives the Interstate Commerce Commission jurisdiction over its drivers. *See* Goldberg v. Faber Industries, 291 F.2d 232 (7th Cir. 1961); Starrett v. Bruce, 391 F.2d 320 (10th Cir. 1968), cert. denied 393 U.S. 971, 89 S.Ct. 404, 21 L.Ed.2d 384.

We find that the District Court properly concluded that the truck drivers were engaged in transportation which was wholly intrastate in character *as defined by the MCA*. We further find the District Court properly concluded that the instant truck drivers were not subject to the jurisdiction of the Commission as defined in the MCA; and hence, these drivers are entitled to the beneficial provisions of the FLSA. The Appellees' cross-appeal for liquidated damages is denied for the reasons stated by the District Court. The judgment of the District Court is affirmed.